UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE AFFILIATED CONSTRUCTION TRADES
FOUNDATION, a division of the
West Virginia State Building and
Construction Trades Council, AFL-CIO

     Plaintiff

v.                          Civil Action No.: 2:04-1344

THE WEST VIRGINIA DEPARTMENT OF
TRANSPORTATION, Division of Highways;
THE UNITED STATES DEPARTMENT OF
TRANSPORTATION; THE WEST VIRGINIA
BOARD OF EDUCATION; THE MINGO
COUNTY REDEVELOPMENT AUTHORITY;
and NICEWONDER CONTRACTING, INC.

     Defendants

MEMORANDUM OPINION AND ORDER

       Pending is the motion of defendant Nicewonder

Contracting, Inc. ("Nicewonder") to reconsider the court's

authority to hear the Davis-Bacon Act Claim, filed initially on

December 3, 2007, as a brief in response to the court's

memorandum opinion and order, entered September 5, 2007.  The

court construed this briefing as a motion to reconsider by order

entered March 18, 2008, noting that the prior briefing on the

standing issues was cursory and that Nicewonder had made a more

specific contention that raised a serious question about the

court's ability to adjudicate the Davis-Bacon Act claim.  The

briefing concluded on January 9, 2009.  Also pending is the
plaintiff's motion to remand, filed August 7, 2008.


                           I. Background


          This case arises from the construction of a portion of
the King Coal Highway, an approximately 93-mile section of the I-
73 Corridor that runs through southern West Virginia.  (Mem. Op.
& Order, Sept. 5, 2007).  The facts giving rise to this action
were described in detail by the court in its September 5, 2007
memorandum opinion and order on the motions for summary judgment
of the plaintiff and the United States Department of
Transportation, and these facts will not be restated in full
here.  The court instead focuses only on those facts relating to
the standing of the Affiliated Construction Trades Foundation
("Affiliated") to bring this action.

          Affiliated is a division of the West Virginia State
Building and Construction Trades Council, AFL-CIO ("Council").
(Constitution, Art. I, § 2).  According to the preamble of the
Constitution and By-laws of the Council ("Constitution"), the
Council was formed by "representatives of the various local
unions in the State of West Virginia" in order to "combine the

                               2

strength of the various local unions in the State so that better
results can be obtained through a Central Organization for the
purpose of harmony and closer cooperation for the betterment of
the Building and Construction Trades Industry of the State."
(Id., preamble).  The Council's objectives, broadly defined,
include "aid[ing] and assist[ing] all affiliated local unions in
the building and construction trades industry," among other, more
specific objectives, such as "promot[ing] the development of
safety and health programs."  (Id., Art. III).


A. Affiliated's Objectives and Principles


        The objectives and principles of Affiliated, as
expressly stated in the Constitution, are:

    a. To aid and assist all affiliated local unions within
    the construction industry in all lawful activities as
    may from time to time be appropriate.

    b. To aid in marketing the construction trades.

    c. To aid in providing construction contract bid
    information to interested parties when it is in the
    best interests of [Affiliated] and the Council to do
    so.

    d. To provide legal services to aid in the achievement
    of the goals of [Affiliated].

    e. Political action function.

    f. To manage, invest, expend or otherwise use funds and

3

> property received from the Council to carry out the
> duties and to achieve the objectives set forth in this
> Constitution and By-laws and for such additional
> purposes and objectives not inconsistent therewith and
> which will further the interest of the Council and its
> members directly or indirectly, as well as the
> interests of the citizens of West Virginia in a healthy
> economy, a healthy political system and in a healthy
> environment.

(Id., Art. III, § 2).


B. Affiliated's Membership


It appears from the preamble of the Constitution,
Article IV of the Constitution, which is entitled "Affiliations,"
and the disclosures made by Affiliated to Nicewonder in response
to Nicewonder's interrogatories and request for production that
local unions and councils comprise the membership.
(Constitution, preamble, Art. IV, § 2; Response to first request
for production).  The preamble indicates that the Council was
formed by "representatives of the various local unions in the
State of West Virginia" in order to "combine the strength of the
various local unions."  (Constitution, preamble).  Under Article
IV of the Constitution, entitled "Affiliations," "Local Unions
with jurisdiction in the State of West Virginia must become full
affiliated members" of the Council.  (Id., Art. IV, § 2).  The
Council's officers include "one (1) representative of each

4

affiliated International Union and one (1) representative of each
local Building Trades Council."  (<u>Id.</u>, Art. VI, § 1).   The
Council's revenues are derived from taxes paid by the affiliated
local unions to the Council.  (<u>Id.</u>, Art. XII, § 1).   The
Constitution expressly holds each union exclusively responsible
for prompt and accurate payment of the tax, and provides that
failure to strictly comply with the payment terms of the
Constitution will result in the loss of privileges as provided to
the union in the Constitution.  (<u>Id.</u>, Art. XIII, § 1).   Moreover,
in response to Nicewonder's request for Affiliated's "membership
lists, rosters, databases, or other compilations which hold
information regarding all or part of the Plaintiff's membership,"
Affiliated produced a list of local unions.  (Response to first
request for production).

        Affiliated nevertheless contends that its members are
the individual construction workers rather than the unions and
councils to which the individuals belong.  (Pl.'s Surreply 5-6).
In an attempt to support this proposition, Affiliated submits the
affidavit of its current director, Steve White.  (White Affidavit
¶ 1).   Therein, White states that Affiliated "is a labor
organization that represents more than 20,000 residents of West
Virginia and surrounding counties . . . .  Many of the

construction workers represented by [Affiliated] are regularly
employed in construction projects such as the construction of the
King Coal Highway."  (Id. ¶ 2).  The court observes that the
expansive generalization by Mr. White that Affiliated represents
20,000 workers must be viewed in the context of the Council's
Constitution which plainly stipulates that the Council's members
are composed of the local unions -- not the members of the local
unions.  The court concludes that Affiliated is a division of the
Council whose members consist of local unions rather than the
members of those local unions.


C. Affiliated's Revenue


        Affiliated is funded by revenues paid to the Council.
(Id., Art. I, § 2).  The Council's revenues are derived from a
"Per Capita Tax [paid by each affiliated local union] as
negotiated per hour, per member, with a minimum of twenty five
($0.25) Cents per hour, per member, to be paid on all members who
are engaged in each and every phase of the building and
construction industry."  (Id., Art. XII, § 1).  "Of the aforesaid
minimum $.25 cents per hour per member, twenty three cents ($.23)
[is] designated to fund [Affiliated] and shall be dedicated to
the objectives of [Affiliated]."  (Id., Art. XII, § 2).

6

## II. Standing

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).  "[I]t is founded in concern about the proper -- and properly limited -- role of the courts in a democratic society." Id.

Standing must be established separately for each form of relief sought.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).  Moreover, standing to sue in an Article III court is a federal question and does not depend upon a plaintiff's prior standing in a state court. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985). Accordingly, Affiliated's observation that the West Virginia Supreme Court of Appeals has permitted it to litigate in other unrelated civil actions, such as Affiliated Construction Trades Foundation v. Public Service Commission of West Virginia, 211 W. Va. 315, 565 S.E.2d 778 (2002) and Affiliated Construction Trades Foundation v. University of West Virginia Board of Trustees, 210 W. Va. 456, 557 S.E.2d 863 (2001), is not relevant to

Affiliated's standing in the present action.[1]

Standing jurisprudence is divided into two strands: (1) Article III standing, enforcing the "case or controversy" requirement of the Constitution, and (2) "prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11-12 (2004)(quoting <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984)).  The former, being constitutional, must be satisfied in every action.  <u>Warth</u>, 422 U.S. at 501.  The latter, being judge-made, may be abrogated by Congressional action granting an express right of action to persons who would otherwise lack prudential standing.  <u>Id.</u>

The Supreme Court succinctly articulated the basic

---

[1] Upon review of these cases, the court finds that they would be unhelpful even if they were relevant to the plaintiff's standing in this action.  In <u>Affiliated Construction Trades Foundation v. Public Service Commission of West Virginia</u>, the question of Affiliated's standing to file a complaint against a public utility with the Public Service Commission was resolved based on the broad language of West Virginia Code § 24-4-6, which provides that "[a]ny person, firm, association of persons, corporation, municipality or county, complaining of anything done or omitted to be done by any public utility subject to this chapter . . . may present to the commission a petition . . . ." And in <u>Affiliated Construction Trades Foundation v. University of West Virginia Board of Trustees</u>, 210 W. Va. 456, 557 S.E.2d 863 (2001), the question of standing was neither raised nor discussed.

constitutional requirements in <u>Lujan v. Defenders of Wildlife</u>,
504 U.S. 555 (1992).  In an often cited passage from that
opinion, the Supreme Court states:

> Over the years, our cases have established that the
> irreducible constitutional minimum of standing contains
> three elements.  First, the plaintiff must have
> suffered an "injury in fact" -- an invasion of a
> legally protected interest which is (a) concrete and
> particularized, . . . and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical,' " . . . .  Second,
> there must be a causal connection between the injury
> and the conduct complained of -- the injury has to be
> "fairly . . . trace[able] to the challenged action of
> the defendant, and not . . . th[e] result [of] the
> independent action of some third party not before the
> court." . . . .  Third, it must be "likely," as opposed
> to merely "speculative," that the injury will be
> "redressed by a favorable decision."

<u>Id.</u> at 560-561.


        In addition to the constitutional requirements, the
Supreme Court has recognized several prudential standing
limitations.  <u>Warth</u>, 422 U.S. at 499.  A plaintiff cannot assert
a "'generalized grievance' shared in substantially equal measure
by all or a large class of citizens."  <u>Id.</u>  A plaintiff must
assert his own legal rights and not those of another.  <u>Id.</u>
Finally, the plaintiff's complaint must fall within the zone of
interests protected by the law invoked.  <u>Elk Grove</u>, 542 U.S. at
12.  "Without such [prudential] limitations -- closely related to
Article III governance -- the courts would be called upon to

decide abstract questions of wide public significance even though our governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."  <u>Warth</u>, 422 U.S. at 500.

An organization or association, such as Affiliated, "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."  <u>Warth</u>, 422 U.S. at 511. Additionally, an organization or association may have standing in a representational capacity for its members, suing based upon an injury to its members' interests and rights.  <u>Id.</u>

A.  Affiliated's Standing to Sue In Its Own Right

Affiliated contends that the defendants' failure to pay Davis-Bacon wages has caused the members of the Council's local unions to lose work time, without stating how that is so. Affiliated further contends that the loss in the union employees' work time has in turn caused a reduction in Affiliated's revenue inasmuch as its revenue is derived from a per capita tax paid by each affiliated local union per hour, per union member.  (Pl.'s

Resp. 7-8).  Affiliated explains that this reduction in revenue
has further injured Affiliated in that it "impede[s] and
impair[s] [Affiliated's] ability to protect the interests of its
members on the job and in the courts."  (Id.).

          The Supreme Court has recognized the standing of an
organization to sue in its own right to protect its interest in
preserving its resources such as time and revenue.  Havens Realty
Corp. v. Coleman, 455 U.S. 363, 378-79 (1982).  The plaintiff in
Havens Realty Corporation was a nonprofit organization whose
purpose was to encourage equal opportunity housing in the
Richmond metropolitan area and whose activities included the
operation of a housing counseling service and the investigation
and referral of complaints concerning housing discrimination.
Id. at 368.  It alleged that the defendants engaged in racial
steering practices and that such practices "frustrated the
organization's counseling and referral services, with a
consequent drain on resources" inasmuch as the organization "had
to devote significant resources to identify and counteract the
defendant's [sic] racially discriminatory steering practices."
Id. at 369, 379.  The court held:

     If, as broadly alleged, [the defendants'] steering
     practices have perceptibly impaired [the
     organization's] ability to provide counseling and
     referral services for low- and moderate-income

                              11

> homeseekers, there can be no question that the
> organization has suffered injury in fact.  Such
> concrete and demonstrable injury to the organization's
> activities -- with the consequent drain on the
> organization's resources -- constitutes far more than
> simply a setback to the organization's abstract social
> interests.

Id. at 379.

Like the plaintiffs in Havens Realty Corporation,
Affiliated has asserted an injury in fact inasmuch as it alleges
that the defendants' conduct has interfered with its ability to
serve its members and has caused a drain on its financial
resources.  Yet, Affiliated has not explained how it can be said
that its members have lost work time and, if not, how
Affiliated's financial resources have thereby suffered.
Consequently, Affiliated's alleged injury is not shown to be
"concrete and particularized," "actual," and "not conjectural or
hypothetical."  The first element of Article III standing has
thus not been satisfied.  Lujan, 504 U.S. at 560-61.

Affiliated has failed, in any event, to demonstrate its
satisfaction of the second element -- a causal connection between
the defendants' conduct (failure to pay Davis-Bacon wages to
Nicewonder's employees) and Affiliated's injury (a reduction in
Affiliated's revenue and, in turn, an interference with its
ability to protect the interests of its members on the job and in

12

the courts).  Affiliated's revenues are tied to the number of
hours worked by the members of its members, the affiliated local
unions.  Assuming that Nicewonder's employees and the employees
of Affiliated's member unions are to some extent one and the
same, it remains unclear how the defendants' failure to pay
Davis-Bacon wages to Nicewonder's employees affects Affiliated's
revenue stream which is based on the number of hours worked, not
the amount of wages earned.  Inasmuch as Affiliated has failed to
demonstrate a causal connection between the defendants' conduct
and its injury, Affiliated lacks standing to sue in its own
right.

B. Affiliated's Standing to Sue on Behalf of its Members

        The Supreme Court has created a three prong test to
assist litigants and courts in analyzing the constitutional and
prudential standing of an organization to sue in a
representational capacity for its members.  An organization may
sue on behalf of its members if (1) its members would otherwise
have standing to sue in their own right, (2) the interests the
organization seeks to protect are germane to its purpose, and (3)
neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit.  United Food

13

<u>& Commercial Workers Union Local 751 v. Brown Group, Inc.</u>, 517 U.S. 544, 553 (1996).

Beginning with the first prong of the three prong test just noted, the court observes that Affiliated has failed to identify any injury that may have been suffered by any member union.  Nor does the court perceive any injury that a union may have suffered from the evidence presented.  Thus, no member union would have standing inasmuch as Affiliated has failed to demonstrate that any such member has suffered an injury in fact.  Accordingly, Affiliated lacks standing to sue on behalf of any member union inasmuch as the member lacks standing to sue on its own behalf.

### III. An Alternative Ground for Dismissal

Even if Affiliated did have standing to sue on behalf of its members, it would not be entitled to relief on its claim arising under the Federal-Aid Highway Act for Davis-Bacon wages because, for the reasons stated <u>infra</u>, the court concludes that the Federal-Aid Highway Act does not provide a private right of action for back wages under a contract that has been determined not to call for work that, under the Federal-Aid Highway Act,

14

requires the payment of prevailing wages in accordance with provisions of the Davis-Bacon Act.

As Nicewonder notes in its briefing, the United States Supreme Court held in <u>Universities Research Association, Inc. v. Coutu</u>, 450 U.S. 754 (1981), that no private right of action exists under the Davis-Bacon Act for a worker under a contract that does not contain prevailing wage stipulations.  <u>Coutu</u>, 450 U.S. at 770.  Nicewonder contends that because the laborers lack a right of action, they have suffered no legally protected injury, and Affiliated, accordingly, cannot sue on their behalf. This argument fails to properly consider that this action arises under the Federal-Aid Highway Act, as opposed to directly under the Davis-Bacon Act.  The court, nonetheless, finds the holding of <u>Coutu</u> and the Court's analysis therein instructive in deciding the issue before the court, which is whether a private right of action exists under the Federal-Aid Highway Act for a worker performing under a contract that does not contain prevailing wage provisions.

A. Davis-Bacon Act

In <u>Coutu</u>, the Court carefully considered the language

15

of the Davis-Bacon Act, its legislative history and the underlying purpose of the legislative scheme.  It noted that the mere fact that a statute is designed to benefit a particular class is not sufficient, standing alone, to suggest that Congress intended that the statute be enforced through private litigation. Id. at 771.  "The Court has consistently found that Congress intended to create a cause of action 'where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case.'"  Id. at 771-72.  Conversely, there is "'far less reason to infer a private remedy in favor of individual persons' where Congress, rather than drafting the legislation 'with an unmistakable focus on the benefitted class,' instead has framed the statute simply as a general prohibition or command to a federal agency."  Id. at 772. The court observed that the provisions of the Davis-Bacon Act do not confer rights directly on the laborers, but rather are written as a directive to federal agencies engaged in the disbursement of public funds.  Id.  The language of the Davis-Bacon Act, accordingly, does not support the implication of a private remedy.  Id.

        Turning to the legislative history of the Davis-Bacon Act, the Court noted that the Act, as originally drafted,

16

provided for post-determination of the prevailing wage and lacked effective enforcement provisions.  Id. at 775.  Congress succeeded in adding pre-determination and enforcement provisions in 1935.  Id. at 776.  Regarding the enforcement provisions, the legislative history of these amendments indicates that "Congress intended to give laborers and mechanics only 'the same right of action against the contractor and his sureties in court which is now conferred by the bond statute." Id. at 776-77 (referring to the Heard Act, ch. 280, 28 Stat. 278, from which the Miller Act derived).  "At the time of the 1935 amendments to the Davis-Bacon Act, it was well established that the failure to supply a contractor's bond did not give rise to a private cause of action under the Heard Act." Id. at 777 n.28.

The Court observed that Congress, in enacting the Davis-Bacon Act, struck a careful balance between the interests of contractors and their employees.  "The contractor is able to 'know definitely in advance of submitting his bid what his approximate labor costs will be,' . . . while the laborer or mechanic is given a right of action to enforce the stipulated wages." Id. at 782.  "To imply a private right of action to sue for Davis-Bacon wages under a contract that does not contain prevailing wage stipulations would destroy this careful balance."

17

Id.


            Finally, the Court noted that if a federal court were
to imply a private right of action under this Act, it would
severely disrupt federal contracting.  Id. at 784.  The Court
explained:

> [T]he implication of a private right of action where
> there has been no Davis-Bacon determination would
> introduce substantial uncertainty into Government
> contracting.  In the case of cost-plus contracts,
> federal budgeting would be disrupted by a postcontract
> judicial determination that wages higher than those set
> forth in the contract must be paid.  Fixed-price
> contracting also would be adversely affected, since it
> is likely that contractors would submit inflated bids
> to take into account the possibility that they would
> have to pay wages higher than those set forth in the
> specifications.  Finally, postcontract challenges would
> disrupt timely and efficient performance of Government
> contracts, and might well provoke jurisdictional
> disputes between construction unions and unions
> representing nonconstruction workers.

Id. at 782-783 (internal footnotes omitted).


B. Federal-Aid Highway Act


            Like the Davis-Bacon Act, the Federal-Aid Highway Act
is written as a directive to a federal agency engaged in the
disbursement of public funds.  It provides:

    The Secretary [of Transportation] shall take such

                              18

> action as may be necessary to insure that all laborers
> and mechanics employed by contractors or subcontractors
> on the construction work performed on highway projects
> on the Federal-aid highways authorized under the
> highway laws providing for the expenditure of Federal
> funds upon the Federal-aid systems, shall be paid wages
> at rates not less than those prevailing on the same
> type of work on similar construction in the immediate
> locality as determined by the Secretary of Labor in
> accordance with sections 3141-3144, 3146, and 3147 of
> title 40 [the Davis-Bacon Act].

23 U.S.C. § 113.  It does not expressly confer private rights to the laborers.

       A review of the legislative history of the Federal-Aid Highway Act reveals that the prevailing wage provisions were added to the Act in 1956.  Federal-Aid Highway Act of 1956, ch. 462, § 115, 70 Stat. 374, 385 (1956).  It is noteworthy that the Federal-Aid Highway Act expressly incorporates the Davis-Bacon Act, which by 1956 had been amended to provide for pre-determination and the limited enforcement mechanisms discussed by the Court in Coutu.  Additionally, the Conference Report states that:

> The conferees rejected a provision in the Senate
> amendment (in sec. 124) that would provide for an
> appeal and judicial review by any aggrieved party, as
> it was feared that court proceedings might delay
> prosecution of projects in the Federal-aid highway
> program, and it was believed that cooperation in good
> faith between State and Federal officials in this
> matter will insure satisfactory results.

H.R. Rep. No. 84-2436 (1956) (Conf. Rep.), reprinted in 1956

19

U.S.C.C.A.N. 889, 2901-02.

Based upon the language of the Federal-Aid Highway Act, which is worded as a directive to the Secretary of Transportation, and the Act's incorporation of the Davis-Bacon Act's pre-determination and limited enforcement provisions, the court concludes that Congress did not intend to create a private right of action under the Federal-Aid Highway Act for a laborer under a contract that does not contain prevailing wage stipulations.  Inasmuch as the laborers could not institute this action on their own behalf, Affiliated cannot do so for them.

Affiliated makes two arguments in response to Nicewonder's contention that the case should be dismissed for want of a private right of action.  First, Affiliated contends that if it is true that a laborer has no private right of action to challenge a decision not to include prevailing wage stipulations after a contract has been let, even though such stipulations should have been included, then the contractors and government agencies will be able to avoid paying prevailing wages by simply agreeing not to put the language in the contract.  As Nicewonder aptly responds, the absence of an enforcement mechanism in such circumstances is an issue for Congress, not the courts, to decide.  Moreover, the laborer is not totally helpless

20

to challenge an agency's coverage and classification determination.  Before the state and the contractor enter into the contract, a labor organization, employee, or any other interested person may appeal the final agency coverage or wage determination to the Department of Labor.  <u>See</u> 29 C.F.R. § 1.1 <u>et seq.</u>; <u>cf.</u> <u>Coutu</u>, 450 U.S. at 760-61.

Affiliated further contends that, inasmuch as this action is brought pursuant to the Federal Declaratory Judgment Act, the absence of a private right of action is "'irrelevant' to whether the Court has the authority to hear and act with an injunction."  (Pl.'s Surreply 10).  Affiliated cites the district court decision of <u>Securities Industry Association v. Board of Governors of the Federal Reserve</u>, 628 F. Supp. 1438, 1441 (D.D.C. 1986), in support of this position.  The court finds <u>Securities Industry Association</u> uninformative on the matter before the court.

Specifically, Affiliated relies on the following statement made by the court in <u>Securities Industry Association</u>.  The court stated:

> Bankers Trust's final procedural objection to issuance of an injunction is that the Glass-Steagall Act does not create a private cause of action and thus a private party such as SIA cannot use it to enjoin the bank.  The Court, however, need not reach the question of

> whether the Act creates an implied right of action, as
> its authority to issue an injunction does not derive
> from that statute, but rather from its inherent power
> to enter orders in aid of its decree.  Moreover, this
> action was brought under the Declaratory Judgment Act,
> 28 U.S.C. §§ 2201 and 2202.  Section 2202 of that Act
> "empower[s] . . . district court[s] to grant
> supplemental relief, including injunctive relief."  28
> U.S.C. § 2202; see also Edward B. Marks Music Corp. v.
> Charles K. Harris Music Pub. Co., 255 F.2d 518, 522 (2d
> Cir.). . . .  Whether or not the Glass-Steagall Act
> creates a private cause of action, therefore, is simply
> irrelevant for purposes of determining whether this
> Court may enjoin Bankers Trust's sales activities.

Id. at 1441.  Taken out of context, this language might appear to support Affiliated's proposition; however, the injunction sought was for the purpose of enforcing an earlier ruling by the court where the defendant-intervenor had made clear its intention to engage in conduct which the court had determined to be illegal in its prior order.  Id.  As the court noted, a "court's authority to issue injunctions in aid of its decrees is unquestioned. . . . Courts necessarily have the power to enter 'such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise.'"  Id.

        The issue presently before the court is its authority to declare that the defendants violated the Federal-Aid Highway Act and to grant Affiliated and its members relief.  The court is reconsidering its earlier decision, not determining whether it

needs to enforce that decision by issuing an injunction under the Declaratory Judgment Act.  Accordingly, <u>Securities Industry Association</u> is not relevant with respect to the issue before the court.

## IV. Conclusion

Based upon the foregoing, the court concludes that Affiliated lacks standing to sue in its own right or in a representational capacity on behalf of its members for the defendants' failure to pay Davis-Bacon Act wages to the laborers who worked on the King Coal Highway project.  It is, therefore, ORDERED that Nicewonder's motion to reconsider be, and it hereby is, granted.  Section III.A of the court's memorandum opinion and order, entered on September 5, 2007, concerning standing is hereby ORDERED vacated.

The court further vacates the order insofar as it grants plaintiff's motions for summary judgment, filed May 1, 2006, and June 8, 2006, and vacates the order insofar as it denies the defendant United States Department of Transportation's motion for summary judgment, filed July 10, 2006.

Accordingly, it is ordered that Affiliated's motions for summary judgment, filed May 1, 2006, and June 8, 2006, be, and they hereby are, denied as to the claim under the Federal-Aid Highway Act for Davis-Bacon wages for lack of standing, and Affiliated's claim under the Federal-Aid Highway Act is ORDERED dismissed.

Inasmuch as all federal claims have been resolved, it is ORDERED as follows:

1.    Affiliated's federal claims be, and they hereby are, dismissed;

2.    Affiliated's remaining state claims be, and they hereby are, remanded to the Circuit Court of Kanawha County; and

3.    This case be stricken from the court's active docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: September 30, 2009

John T. Copenhaver, Jr.
United States District Judge

24